UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

No. 1:20-mj-03851-AOR

UNITED STATES OF AMERICA

v.

HABIB GEAGEA PALACIOS,

    **Defendant.**
_____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia Valle)?    __ Yes X No

2. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)?    __ Yes X No

3. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss)?    __ Yes X No

    Respectfully submitted,

    ARIANA FAJARDO ORSHAN
    UNITED STATES ATTORNEY

BY:    /s/ *Alexander T. Pogozelski*
    Alexander T. Pogozelski (Court ID No. A5502549)
    Trial Attorney
    United States Department of Justice
    Criminal Division, Fraud Section
    1400 New York Avenue, N.W.
    Washington, D.C. 20005
    Tel: (202) 510-2208
    Email: alexander.pogozelski@usdoj.gov

AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the

Southern District of Florida

| United States of America | ) |
|---|---|
| v. | ) |
| HABIB GEAGEA PALACIOS | ) Case No. 1:20-mj-03851-AOR |
| | ) |
| | ) |
| | ) |
| | ) |
| *Defendant(s)* | ) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __July 2017 through October 2020__ in the county of __Miami__ in the __Southern__ District of __Florida__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 846 | PALACIOS conspired with others to dispense and distribute a Schedule II controlled substance, that is, a mixture and substance containing a detectable amount of Oxycodone. |

This criminal complaint is based on these facts:

See the attached affidavit of FBI Special Agent Jacqueline Erwin

☑ Continued on the attached sheet.

*Complainant's signature*

Special Agent Jacqueline Erwin, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by FaceTime.

Date: 10/20/2020

*Judge's signature*

City and state: Miami, Florida

Alicia M. Otazo-Reyes, Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

No. 1:20-mj-03851-AOR

UNITED STATES OF AMERICA

v.

HABIB GEAGEA PALACIOS,           FILED UNDER SEAL

    Defendant.
_____/

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Special Agent Jacqueline Erwin, being duly sworn, do hereby depose and state:

### AFFIANT'S BACKGROUND

1. I am a Special Agent with the Federal Bureau of Investigation (FBI), United States Department of Justice, currently assigned to the Miami, Florida Field Division. As such, I am an investigative or law enforcement officer of the United States within the meaning of Title 21, United States Code, Section 878, as well as Title 18, United States Code, Section 2510(7), and therefore am empowered to conduct investigations of, and make arrests for, the controlled substances offenses enumerated in Title 21 of the United States Code.

2. I have been an FBI Special Agent since March 2018 and have been assigned to the Miami Field Division since July 2018. While employed with the FBI, I have participated in various investigations involving drug diversion, wire fraud, health care fraud, and money laundering.

3. This affidavit is written in support of a criminal complaint charging

HABIB GEAGEA PALACIOS ("PALACIOS") with conspiracy to dispense and distribute a controlled substance, in violation of Title 21, United States Code, Section 846. The facts contained in this affidavit are based on my personal knowledge and observations as well as facts provided by other law enforcement officers, witnesses, and documents. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that PALACIOS and others, known and unknown, conspired to dispense and distribute a controlled substance, in violation of Title 21, United States Code, Section 846.

4. This affidavit does not contain all the facts of this investigation known to me or to other law enforcement personnel. Rather, it sets forth only those facts necessary to establish probable cause in support of a criminal complaint charging PALACIOS with a violation of Title 21, United States Code, Section 846.

## NATIONAL OPIOID EPIDEMIC AND PILL MILLS

5. Oxycodone (brand name OxyContin, Percocet, Roxicodone) is a generic name for a narcotic analgesic classified under federal law as a Schedule II controlled substance, meaning that the drug has an accepted medical use and a high potential for abuse. Oxycodone is a medication used to treat severe pain. Like other opioids, Oxycodone is highly addictive. Due to its addictive nature, the lawful and legitimate use of Oxycodone often leads to addiction and the unlawful and unmonitored use of opioid-based street drugs, such as heroin and fentanyl.

6. Due to its addictive nature, individuals often abuse Oxycodone, which has created a black market for the narcotic. While many patients receive Oxycodone from legitimate physicians genuinely practicing medicine, others, including drug traffickers,

2

often obtain Oxycodone through complicit doctors who prescribe narcotics without a legitimate medical purpose and outside the usual course of professional practice in exchange for money. This criminal scheme has come to be known as a pill mill scheme; it is also referred to as opioid or drug diversion.

7. Pill mill (or drug diversion) schemes benefit the complicit doctors through the generation of additional business revenue from the addition of large volumes of new patients, often drug traffickers, who pay to visit the doctor for the sole purpose of obtaining a prescription for Oxycodone. The scheme benefits drug traffickers by providing them with a supply of narcotics to sell on the black market.

8. A pill mill scheme cannot operate without a medical professional capable of prescribing narcotics and willing to do so in violation of the law. From a review of various statutes and regulations, I know that the dispensing and distribution of controlled substances must meet certain federal and state rules and regulations. Specifically, I know the following:

   a. The Controlled Substances Act ("CSA"), 21 U.S.C. § 801 *et seq.*, creates a comprehensive regulatory regime criminalizing the unauthorized manufacture, distribution, dispensing and possession of substances classified in any of the Act's five schedules.

   b. Pursuant to Title 21, United States Code, Section 822, controlled substances may only be prescribed, dispensed, or distributed by persons registered with the Attorney General of the United States to do so (with some exceptions, such as delivery persons). The Attorney General has delegated to the Drug Enforcement Agency ("DEA") authority to register such persons.

   c. Title 21, Code of Federal Regulations, Section 1306.04, requires that prescriptions for controlled substances written by physicians "be issued for a legitimate medical purpose" and that the physician be "acting in the usual course of his professional practice."

3

    d. Title 21, United States Code, Section 841(a)(1), makes it unlawful, except under circumstances authorized by the statute, "for any person knowingly or intentionally ... to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense a controlled substance." Title 21, United States Code, Section 846, makes it unlawful for any person to "attempt or conspire" to violate the CSA.

    e. According to Florida Statute 459.0137(3)(c), an osteopathic physician, a physician assistant, or an advanced registered nurse practitioner must perform a physical examination of a patient on the same day that the physician prescribes a controlled substance to a patient at a pain management clinic.

## THE DEFENDANT AND RELEVANT ENTITY

9. General Care Center Inc. ("GCC") was a cash-only pain clinic located at 7805 SW 24th Street/Coral Way, Suite 101, Miami, Florida 33155.

10. PALACIOS was a resident of Miami-Dade County. According to documents filed with Florida's Secretary of State, PALACIOS incorporated GCC as Humana General Care Center Inc. in or around March 2007. In or around March 2011, Humana General Care Center Inc. changed its name to GCC. PALACIOS was GCC's registered agent until in or around April 2011. From that point on, a series of doctors served as GCC's registered agents and purported owners. PALACIOS was a signatory on GCC's corporate bank account and actively managed the clinic's day-to-day operations until approximately April or May of 2020.

## PROBABLE CAUSE

11. In February 2018, based on a tip that GCC "dispensed pills and asked few questions," the government began investigating unlawful prescription practices at GCC. The ensuing investigation revealed evidence that GCC unlawfully dispensed and distributed Oxycodone to individuals who had no legitimate medical need for the drug.

4

12. As detailed below, this evidence includes: (1) statements from cooperating witnesses who were hired by PALACIOS and worked at GCC; (2) undercover visits and recordings, including a recording in which PALACIOS and other GCC staff interrogated a confidential source regarding who sent him/her to GCC, with PALACIOS remarking that the individual who supposedly sent the source to GCC had a "snitch face"; and (3) analysis of prescription data demonstrating that GCC bears many of the hallmarks of a pill mill clinic.

## COOPERATING WITNESSES

13. One cooperating witness is a physician who worked at GCC in late 2017 and early 2018 ("Physician 1").[1]

14. According to Physician 1, s/he was referred to GCC by GCC's purported owner and subsequently met with PALACIOS to discuss working at the clinic.

15. Despite not having any experience treating pain management patients and not having the requisite qualifications to work at a pain clinic, which Physician 1 discussed with PALACIOS, PALACIOS hired Physician 1 to see patients at GCC.

16. PALACIOS paid Physician 1 $60 per patient, in cash. Physician 1 acknowledged that the form and method of payment were novel, as physicians are usually paid salaries (not per patient), and by check or electronic funds transfer (not cash).

17. Despite the fact that PALACIOS lacked medical training and licensing, PALACIOS instructed Physician 1 that patients must leave GCC with a prescription for the medication they had been previously receiving. According to Physician 1, s/he

---

[1] This cooperating witness signed a plea agreement acknowledging his/her criminal conduct and is cooperating with the hope of receiving a lesser sentence once s/he is convicted for his/her unlawful conduct at GCC.

5

prescribed every patient s/he saw at GCC Oxycodone Hydrochloride 30 mg ("Oxycodone 30 mg"), the highest quick-release dosage of the drug currently available. Physician 1 acknowledged that s/he was paid to write prescriptions and complete patients' charts to give the clinic the appearance of legitimacy. Physician 1 stated that GCC staff at the front desk were largely responsible for determining what prescriptions patients should receive. When asked about patient charts at GCC, Physician 1 stated that all charts at GCC were "cookie cutter." Based on my training and experience, Physician 1 was referring to the fact that there was very little variation between the details in the patient files: they were formulaic and mostly interchangeable. Preliminary review of numerous GCC patient electronic medical records, which were obtained via a search warrant, corroborates Physician 1's statements; many patient records contained formulaic notations with little variation between the details in different patient files.

18. Physician 1 admitted that during his/her tenure at GCC s/he wrote prescriptions for Oxycodone 30 mg for patients who did not have a legitimate medical need for the medication. Physician 1 explained that many patients who presented to him/her appeared to be young and healthy, and their requests for Oxycodone 30 mg did not make sense to Physician 1. For example, these patients' requests for Oxycodone were inconsistent with their medical histories, descriptions of their pain, and their patient files. Physician 1 stated that, for these patients, even though s/he did not believe Oxycodone was warranted or medically indicated, s/he nevertheless prescribed the patients Oxycodone because of his/her agreement with PALACIOS.

19. Physician 1 further admitted that PALACIOS requested that s/he write prescriptions for patients Physician 1 had never even seen. According to Physician 1,

PALACIOS gave Physician 1 prescriptions for patients PALACIOS claimed had come to GCC on a different day and asked Physician 1 to rewrite the prescriptions. Physician 1 complied and signed prescriptions for Oxycodone for patients s/he never saw. In return for signing the prescriptions, PALACIOS paid Physician 1 in cash.

20. On other occasions, PALACIOS gave Physician 1 lists of patients he claimed could not come to GCC and asked Physician 1 to write prescriptions for them. Physician 1 complied and again wrote prescriptions for Oxycodone for patients s/he did not see. In return, PALACIOS paid Physician 1 in cash.

21. According to Physician 1, every time s/he was at GCC seeing patients, PALACIOS was also there.

22. Another cooperating witness is GCC's former office manager ("Individual 1").[2] Individual 1 described GCC as a "pill mill" that should be closed down.

23. According to Individual 1, PALACIOS was GCC's true owner, despite the fact that physicians were held out to be GCC's owners.

24. Prior to working at GCC, Individual 1 visited the clinic as a patient for several years, as corroborated by data from Florida's Prescription Drug Monitoring Program ("PDMP"), which keeps a record of prescriptions for controlled substances dispensed by pharmacies.[3] In or around October 2017, PALACIOS hired Individual 1 to

---

[2] This individual is cooperating with the hope of receiving a lesser sentence once s/he is convicted for his/her unlawful conduct at GCC.

[3] According to Individual 1's PDMP data, Individual 1 routinely filled prescriptions written by GCC doctors for large quantities of Oxycodone 30 mg. For example, on July 12, 2017, Individual 1 filled two separate prescriptions written by a GCC physician for Oxycodone 30 mg: one prescription for 100 pills, and another for 130 pills. Individual 1 filled these prescriptions at two different pharmacies, utilizing different forms of payment (Medicare is listed as the payor for one). Individual 1 has admitted that s/he had no legitimate medical need for Oxycodone.

7

work at GCC. His/her initial responsibilities included "crowd control," because arguments and fist fights often broke out among people at GCC and resulted in the police responding.

25. After about six or seven months of working at GCC, PALACIOS promoted Individual 1 and showed him/her how to run the office. Individual 1 served as the de facto office manager and eventually took over the administrative duties at the clinic.

26. According to Individual 1, new patients at GCC generally paid $300 for the first visit, and then $250 for each subsequent visit. All patients at GCC paid in cash, as GCC did not accept insurance.[4]

27. Based on my review of PDMP data for multiple GCC patients, I know that many of GCC's patients were beneficiaries of health insurance policies, including Medicare, that would have covered the cost of the medical visit had the patient visited a doctor that accepted insurance. Instead, these patients paid cash for visits with doctors at GCC. Based on my training and experience, I know that patients seeking opioids often pay cash for visits with physicians at pill mills rather than rely on their insurance benefits

---

[4] Banking records corroborate the cash-only nature of GCC's business and PALACIOS's ownership of the clinic. Specifically, large cash deposits were made into several accounts over which PALACIOS had sole ownership or exercised control. For example, GCC's business checking account, on which PALACIOS was a signatory, reflects cash deposits totaling approximately $401,155 for the year 2018. A business account in the name of 11600 Property LLC, and on which PALACIOS was the sole signatory, reflects cash deposits totaling approximately $415,455 for the same time period. And a personal checking account on which PALACIOS was the sole signatory shows cash deposits totaling approximately $116,155 for the same time period. Despite depositing nearly $1 million in cash into these accounts in 2018, PALACIOS claimed only $18,259 in adjusted gross income on his 2018 federal individual income tax records and $154,630 in other income on his supplemental income filing.

8

to pay for visits with legitimate doctors because they know the pill mill doctor will prescribe them the opioids they are seeking.

28. At the end of each workday, Individual 1 provided all the cash paid by GCC patients to PALACIOS, who counted the cash and compared the amount to the number of patients that visited that day. PALACIOS then determined how much to pay the physician working that day. In general, Individual 1 recalled that PALACIOS paid doctors approximately $100 per patient. At times, Individual 1 paid GCC's doctors on PALACIOS' behalf.

29. PALACIOS paid Individual 1 $20 in cash for every patient that visited GCC.

30. According to Individual 1, PALACIOS instructed doctors that they must write prescriptions for Oxycodone 30 mg. For example, Individual 1 personally heard PALACIOS tell one of GCC's physicians that s/he had to write prescriptions for Oxycodone or PALACIOS would not pay him/her.

31. Many patients at GCC have told Individual 1 that they were using falsified MRIs in order to make it appear as though they had medical conditions requiring pain prescriptions. Individual 1 told PALACIOS about the falsified MRIs, and PALACIOS told him/her not to worry about it as it was the patients' problem, not GCC's. According to Individual 1, PALACIOS instructed personnel at GCC not to verify MRIs.

32. Individual 1 also stated that all of the urine testing done at GCC was fake or falsified. Based upon my training and experience, I know that legitimate medical clinics often administer urine testing to patients in order to verify that they are actually

taking the pain medications that they are prescribed, such as Oxycodone, and not diverting them.

33.     Individual 1 admitted that s/he helped GCC patients tamper with their urine samples, and alter their testing results, by providing them with crushed up Oxycodone pills to put in their urine to ensure they tested positive for the drug, thereby making it appear as though they were taking the Oxycodone as prescribed. Individual 1 did this at PALACIOS' instruction. A video recording from an undercover visit to GCC made as part of the investigation corroborates this, as the recording captured Individual 1 providing a confidential source with crushed Oxycodone to put into his/her urine sample.[5]

34.     According to Individual 1, many patient recruiters (or sponsors) brought patients to GCC for the purpose of obtaining medically unnecessary opioid prescriptions. Based upon my training and experience, I know that pain clinics that divert narcotics often require individuals they know to introduce and tacitly vouch for new patients, so-called patient recruiters or sponsors. These patient recruiters bring patients to the pain clinics in order to obtain prescriptions for Oxycodone 30 mg and the patient recruiters usually pay for the office visit. In return, the patient recruiters obtain the patient's Oxycodone 30 mg pills in exchange for cash or another agreed-upon payment (often a portion of the pills), and then sell the pills on the black market.

35.     According to Individual 1, some patient recruiters brought as many as fifty (50) patients to GCC. Individual 1 further stated that, on at least some occasions, patient recruiters picked up Oxycodone 30 mg prescriptions from GCC in batches for their

---

[5] This undercover visit was recorded before Individual 1 became a cooperating witness.

10

patients (*i.e.*, their patients did not even visit the clinic to obtain the prescriptions written for them).

36. Individual 1 stated that PALACIOS directed and knew about all of the unlawful activities at GCC.

## **UNDERCOVER VISITS**

37. Between in or around February 2018 through the present, more than 15 undercover visits at GCC were conducted. These visits revealed that GCC's physicians prescribed high doses and pill counts of Oxycodone without a legitimate medical purpose and outside the course of professional practice, as demonstrated by the physicians' failure to conduct physical examinations or appropriate medical consultations of patients and the near uniformity in the physicians' prescribing practices.

38. These undercover visits, most of which were captured on audio and video recordings, further revealed the following: (1) that the confidential sources[6] paid between $250 and $300 in cash for their visits with GCC's physicians; (2) that GCC's waiting room was frequently crowded, with approximately fifty (50) patients waiting to see the doctor at any given time; (3) that the confidential sources were coached by GCC intake staff on what to say in order to obtain a pain prescription; (4) that their visits with GCC's doctors were very brief, typically lasting only a few minutes; (5) that GCC's physicians generally did not perform a physical examination and asked the confidential sources limited, perfunctory questions during their brief encounters; and (6) that GCC's physicians almost always prescribed the confidential sources high doses of Oxycodone 30 mg.

---

[6] These confidential sources are proven reliable informants. In some instances, the confidential informants have been compensated for their undercover work.

39. Specifically, during one of the recorded undercover visits on or about November 21, 2019, a confidential source ("CS") posing as a new patient was approached by PALACIOS and Individual 1 and taken to an office suite across the street from the clinic for questioning. While walking across the street, PALACIOS asked CS who sent him/her to GCC. CS gave PALACIOS a name, and PALACIOS responded that he did not know that person. CS, PALACIOS, and Individual 1 then entered the office suite, where another GCC staff member was present. In response to questioning, CS provided a phone number for the man who supposedly sent him/her to GCC. Individual 1 then exited the suite and called the number CS provided. PALACIOS told CS that he can't "sell to him/her" because s/he was asking a million questions of GCC's administrator. After efforts to reach the referral source were unsuccessful, Individual 1 asked CS for a picture of the man. CS pulled up a photo of the man on his/her phone and handed the phone to Individual 1. Individual 1 showed the photo to PALACIOS, who said he did not know the man. PALACIOS asked Individual 1 if s/he knew the man, and Individual 1 responded that s/he did not. PALACIOS then remarked that the man in the photo had a "snitch face." CS ultimately saw a doctor at GCC that day and received a prescription for Percocet. Based on my training and experience, I know that owners of legitimate clinics do not aggressively question their patients regarding "who sent them," do not refer to the prescribing of opioids as "selling" to patients, and are not concerned that patients might have been referred to the clinic by someone with a "snitch face."

### PRESCRIPTION DRUG DATA

40. Law enforcement has also reviewed Florida's PDMP data and reports generated by a pharmacy chain to analyze the prescribing patterns of the doctors

employed by GCC. This data analysis revealed that the prescribing patterns of GCC's physicians bear many of the hallmarks of a pill mill clinic and corroborate other evidence in this case.

41.     For example, law enforcement analyzed the prescribing patterns of Physician 1 while s/he worked at GCC in late 2017 and early 2018. Physician 1's PDMP data revealed that, out of all the controlled substance prescriptions s/he wrote while working at GCC, more than 99% of them were for opioids. And of those opioid prescriptions, more than 95% were for Oxycodone 30 mg. In total, according to PDMP data, during his/her brief tenure at GCC, Physician 1 prescribed more than 38,000 Oxycodone 30 mg pills; in the four years prior to working at GCC, Physician 1 wrote only three prescriptions for Oxycodone 30 mg. Based upon my training and experience, these facts are evidence Physician 1 prescribed Oxycodone 30 mg without a legitimate medical purpose and outside the course of professional practice.

42.     Similarly, law enforcement analyzed the prescribing patterns of another physician employed by GCC ("Physician 2") for the period January 1, 2019 through August 30, 2019, while s/he worked at the clinic. Physician 2's PDMP data revealed that, out of all the controlled substance prescriptions s/he wrote during this time period, more than 99% of them were for opioids. And of those opioid prescriptions, more than 95% were for Oxycodone 30 mg. In total, during this eight-month period, Physician 2 prescribed more than 220,000 Oxycodone 30 mg pills. Based upon my training and experience, these facts are evidence Physician 2 prescribed Oxycodone 30 mg without a legitimate medical purpose and outside the course of professional practice.

43.     Reports generated by a large pharmacy chain analyzing the prescribing practices of physicians employed by GCC revealed similar patterns indicative of opioid diversion. For example, a report analyzing Physician 2's prescribing practices identified numerous red flags of diversion, including the following: (1) Physician 2 routinely wrote prescriptions for large doses of controlled substances; (2) Physician 2 wrote the same medication dosage directions for a large number of patients; (3) Physician 2's prescriptions were for unusually large quantities or high starting doses; (4) Physician 2 provided the same diagnosis for a majority of patients; and (5) Physician 2 was located relatively far from the pharmacy where his/her prescriptions were filled. This pharmacy then implemented a "central block" on Physician 2, refusing to fill any more of his/her controlled substance prescriptions.

44.     At least one other physician employed by GCC was also the subject of a central block by this pharmacy chain.

## **CONCLUSION**

45.     Wherefore, based upon the above information, I believe probable cause exists that, in Miami-Dade County, in the Southern District of Florida, HABIB PALACIOS did conspire with others to dispense and distribute a controlled substance, in violation of Title 21, United States Code, Section 846.


[remainder of the page intentionally left blank.]

46. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief this 20th day of October, 2020, in Miami, Florida.

FURTHER AFFIANT SAYETH NAUGHT

*Jacqueline Erwin*
Jacqueline Erwin
Special Agent
Federal Bureau of Investigation

Attested to in accordance with the requirements of
Fed. R. Crim. P. 4.1 by FaceTime this 20th day of
October, 2020

ALICIA M. OTAZO-REYES
UNITED STATES MAGISTRATE JUDGE

15